FILED

2006 Mar-30  AM 10:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **AUDRA BRASHER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. CV 03-B-2648-S** |
| | } | |
| **BLUE CROSS AND BLUE SHIELD** | } | |
| **OF ALABAMA,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on the defendant's Motion for

Summary Judgement.  (Doc. 12.)[1]  Plaintiff, Audra Brasher, brought this action against

her former employer, Blue Cross Blue Shield of Alabama after it terminated her

employment for excessive absences.  Plaintiff contends that the absences for which she

was terminated were protected under the Family and Medical Leave Act, 29 U.S.C. §§

2601-2654, and for that reason, defendant could not fire her for taking time off work.

Defendant does not deny that plaintiff's absences were medically-related, but contends

that the absences were not protected leave under the FMLA.  If, in fact, plaintiff's

absences do not qualify as protected under the FMLA, Blue Cross was free to fire her

without running afoul of the Act.  Upon consideration of the record, the submissions of

the parties, the arguments of counsel, and the relevant law, the court is of the opinion that

Defendant's Motion for Summary Judgement is due to be granted.

---

[1]  Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

I.   **SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.  *See id.* at 255.  Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

2

II.   **STATEMENT OF FACTS**[2]

Defendant hired plaintiff in January 1988.  (Pl. Depo., Def.'s Ex. A at 15.)  She

held a number of jobs within Blue Cross before taking a position as a technical instructor

in the Corporate Training Department in August 2000.  (Id. at 17-20.)  Plaintiff's duties

as a technical instructor consisted primarily of training other Blue Cross employees one-

on-one, as well as in classroom settings.  (Id. at 31.)  Jeanne Shannon was her immediate

supervisor from the time plaintiff joined the Corporate Training Department,  in August

of 2000, until Shannon was transferred in January 2003.  (Id. at 22.)  Jeff Hairrell

replaced Shannon as Manager of Technical Instructors on March 10, 2003.  (Pl. Depo. at

26; Hairrell Depo., Def.'s Ex. B at 7.)  In the interim, Michelle Grill, Jo Ann Conklin, and

Barbara Henry shared the duties of managing the department and acting as plaintiff's

immediate supervisors.  (Pl. Depo. at 26-28.)  Plaintiff was a technical instructor at the

time of her termination on July 7, 2003.  (Id. at 20, 194; Pl. Depo., Ex. 16.)

While working in the Corporate Training Department, plaintiff experienced health

problems and was often absent from work.  (Def.'s Ex. D at 10-11; Def.'s Ex. D, Tab 3.)

In November of 2002, when plaintiff learned that she needed a hysterectomy, she told her

manager, who initiated the FMLA application process on plaintiff's behalf by contacting

---

[2]  As required when determining a Motion for Summary Judgment, the Statement of Facts reflects the facts in the light most favorable to Ms. Brasher, the non-moving party.  All disputed facts are resolved in her favor and all reasonable inferences arising from those facts are drawn in her favor.  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 3188-89, 111 L. Ed. 2d 695 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

Associate Resources. (Pl. Depo. at 38-42.) Wanda Edwards, a Blue Cross employee in the Associate Resources department, coordinated with plaintiff's doctor and his staff to obtain the required medical documentation. (Pl. Depo., Ex 1, 2.) According to plaintiff:

> [W]hen my doctor and I decided that I needed the surgery, then I let my manager know. And to the best of my recollection, she handled with Associate Resources the information to the doctor and Blue Cross. I didn't, as far as I can remember. I just made sure everything was in order, that those were the dates that I needed, that that was the correct surgery, and initialed the [medical leave forms].

(Pl. Depo. at 40-41.) Dr. Charles Vennson certified plaintiff's need for FMLA leave from November 27, 2001 through January 8, 2002. (Id. at Ex. 2.) Plaintiff was not certified for intermittent or reduced leave relating to her surgery. (Id.)

The hysterectomy alleviated some of plaintiff's health problems, but she continued to experience lower back pain and frequent viruses. (Pl. Depo. at 43.) Regarding plaintiff's ongoing health problems, she states:

> When I get sick, it's not something that I get over like most everyone else does. A lot of people don't understand that. Like if I get a virus and I throw up or have diarrhea, it gets worse. And I get dehydrated and sometimes I have to go to the hospital to get rehydrated. It's something that has gone on prior to surgery and still continues to go on.

(Id. at 146-47.) Plaintiff continued to suffer from health problems and her frequent absences also continued. Plaintiff's time record indicates that in the year 2000 plaintiff reported a total of 94.5 sick hours, which in an eight-hour work day equates to 11.8 days of missed work. (Def.'s Ex. D at 10-11; Def.'s Ex. D, Ex. 3.) In 2001, plaintiff reported a total of 148 sick hours, or 18.5 days of work. (Id.)

4

As an exempt employee, plaintiff did not have to "earn" sick leave, time off due to illness is paid leave. (Def.'s Ex. D, Ex. 2). However, in Blue Cross's Employee Handbook, exempt employees are cautioned against excessive time off from work to the extent that it interferes with job performance. (Id.) Furthermore, the Handbook states that an exempt employee's "manager has the responsibility to determine the gravity of any performance problem or other concern and act accordingly. Action taken may be counseling, probation, or termination, depending on the circumstances involved." (Id.)

On March 20, 2002, Shannon met with plaintiff to discuss her excessive absences. (Pl.'s Depo, Ex. 6.) Shannon expressed her concern about plaintiff's attendance. She reviewed plaintiff's time records emphasizing the number of sick hours plaintiff had reported in 2000 and 2001 and pointed out that she had already used 43 hours in the first three months of 2002. (Id.) Plaintiff was told that the meeting was just a warning and that nothing formal, other than documentation of the meeting, would go into her file. (Id.) Shannon did, however, emphasize that plaintiff's regular attendance was extremely important to the Department and told her that they would have to meet again if no improvement was shown. (Id.)

Shannon called a Technical Team meeting on September 29, 2002 during which she went over some basics including vacation policies. (Pl. Depo, Ex. 7.) A memo recapping the meeting, stating that it is "[c]orporate policy that associates cannot key

vacation time for sick time," was sent to all members of the team, including plaintiff. (Id.) (emphasis in original).

On October 4, 2002, Shannon met with plaintiff regarding her attendance for a second time.  (Pl. Depo., Ex. 8.)  Shannon expressed her concerns once more, and asked plaintiff if she had "a medical condition that would cause [her] to need to apply for medical leave."  (Id.)  She told plaintiff that if she was "out four days consecutively, [she could] apply through Wanda Edwards," who had helped plaintiff apply for FMLA leave in the past.  (Id.)  Shannon also told plaintiff that, thereafter, a doctor's excuse for plaintiff or her children would be required upon returning to work after taking a sick day, and that any *unexcused* sick time accrued after today's meeting will result in further disciplinary action "which could include [her] being subject to termination."  (Id.)  A formal warning was documented and placed in plaintiff's personnel file and a copy forwarded to Associate Resources.  (Id.)

When plaintiff continued to report an excessive number of absences, she was called again to meet with management.  On March 3, 2003, plaintiff received a "final written warning" from then acting manager, Barbara Henry.  (Pl. Depo., Exs. 10, 16.) The memo documenting the meeting states, in part:

> [F]rom this point, no more than eight (8) hours of sick time per month and only in situations where she is critically ill will sick time be tolerated.  **Should there be a serious illness, Audra will need to bring a doctor's excuse for the absence and/or consider applying for any necessary leave time**.  If it is determined that sick time continues to be abused, termination of employment may result.

6

(Id. at Ex. 10, emphasis added.)  Plaintiff was very upset because, as she told Henry, during her performance evaluation on January 6th, she had allegedly been told that her sick hours had "started over" on January 1, 2003.  (Id.)  Therefore, she was under the impression that she "wouldn't have any more issues with [her] time unless [she] was out sick excessively."  (Id.)  Nevertheless, plaintiff signed the memo, which was also signed by Henry and Michelle Grill, as witnessing manager.  (Id.)

Approximately two months later, on May 6, 2003, plaintiff's doctor advised that she take a few days off work.  (Pl. Depo. at 136; Pl. Depo, Exs. 10-12.)  Plaintiff called her manager, Jeff Hairrell, and told him the situation.  He advised her to contact Associate Resources, which she did, and the paperwork required to apply for FMLA leave was prepared by that department while she was out sick.  (Pl. Depo. at 12-13.)  When she returned to work on May 9th, she signed the forms and FMLA leave was approved and retroactively applied for May 6th through May 8th.  (Id.)  Plaintiff returned to work without restrictions.  (Id.)  Again, she was not certified for intermittent or reduced leave related to her latest period of incapacity.  (Id.)

Plaintiff was not absent from work again until Thursday, June 27, 2003.  Early that morning, she visited the emergency room complaining of nausea, vomiting, diarrhea, and dehydration.  (Pl. Depo. at 153-55; Pl.'s Ex. 13.)  Plaintiff received fluids through an IV and several medications.  (Id.)  Her treating physician noted clinical impressions of "vomiting/diarrhea" and "Gastroenteritis - acute".  (Id.)  Plaintiff was released from the

7

emergency room at 10:20 a.m. with prescriptions for Phenergen and Lortab and with instructions to rest.  (Pl. Depo. at 157-58.)  She recuperated at home on Thursday afternoon and was unable to return to work on Friday, June 28 because of the side effects of her medications and her lower back pain.  (Id. at 165).  She testified:

> Q:  And why were you unable to come to work on the 28th?
>
> A:  Because of the medications that they gave me.  It, of course, incapacitated me.  I was unable to function the way I needed to function in order to drive.  Of course, on most of those medications, don't operate machinery or drive, different things like that.  I was very dehydrated and weak and had no energy.  I was still having, of course, the low back pain. Medication only - you know, that's just a temporary fix for a few hours.

(Id.)   Plaintiff testified that she was not able to leave the house for the rest of the weekend, but was able to return to work on Monday, July 1, 2003.  (Id. at 167, 171.)

Before leaving for the hospital the morning of June 27, plaintiff called Leigh Holcomb, her team leader, to tell her the situation.  (Pl. Depo. at 159.)  Later that morning, plaintiff asked her daughter to call Marcia Curry, another instructor, to make her aware of plaintiff's situation.  (Id. at 159-62)  Plaintiff did not make the call herself, she claims, because her IV rendered her unable to use the phone.  (Id. at 161)  Plaintiff admits that at the time neither Holcomb or Curry were members of management.  (Id. at 161-62.) Plaintiff's immediate supervisor, Jeff Hairrell, was out of town, but three other managers, including Barbara Henry, were in the office that day.  (Id. at 162; Doc. 13, Hairrell Depo. at 10.)  Plaintiff made no attempt to communicate directly with a manager about her illness.  (Pl. Depo. at 159-164.)

Plaintiff claims that she was given an excuse from work, signed by her treating physician, but she did not give it to anyone at Blue Cross because, she says, she was never asked for it. (Id. at 168-170.) Plaintiff did not inquire into or apply for FMLA leave for her illness on June 27 and 28, 2003. (Id. at 170-171.) Instead, upon her return to work on July 1st, plaintiff "keyed" one of her absences as sick time and the other as vacation time because, she says, she had been told she was only allowed eight hours sick leave per month. (Id. at 200.)

On Tuesday, July 2nd, Jeff Hairrell had a formal meeting with plaintiff in which he expressed the following concerns: (1) plaintiff did not follow proper protocol in calling in sick on July 27th, (2) she "keyed" one of the two sick days she took the previous week as vacation, in violation of established company policy, and (3) plaintiff violated the terms of the March 3rd Memo by taking more than eight hours sick leave in the month of June without providing a doctor's excuse. (Hairrell Depo. at 12-14, 17; Pl. Depo. at 181-183.) Plaintiff was aware that her job was in serious jeopardy and was visibly upset. (Hairrell Depo. at 37.) Later in the day on July 2nd, she went to Hairrell's office and told him that, "two years ago, Jeanne Shannon gave us permission to call a team leader if a manager was not available." (Id.) However, in the past, plaintiff had always called a member of management when she was going to be out sick. (Pl. Depo., Ex 16.)

Plaintiff was ultimately terminated on July 7, 2003. (Id.) The reason for her termination was threefold: (1) "attendance related," (2) "failure to comply with

9

instructions or established operating procedures," and (3) "falsification of company records."  (Id.)  The Blue Cross Discipline Report documenting plaintiff's termination was signed by Jeff Hairrell, Tina Shaw and plaintiff.  (Id.)  Plaintiff utilized defendant's appeals process by filing a Grievance Report, (Pl. Depo., Ex 17), but her termination was upheld.  (Id.)

## II.   <u>DISCUSSION</u>

Plaintiff contends that Blue Cross interfered with, and eventually terminated her for asserting, her substantive rights under the FMLA.  The Act provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a "serious health condition" as defined by the Act.  29 U.S.C. § 2612(a)(1).  After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave.  29 U.S.C. § 2614(a).  To insure the availability of these guarantees, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1).

In order to avail herself of the protections provided by the Act, an employee must give her employer adequate notice of her need to take leave under the Act.  The regulations set out the requirements for adequate notice as follows:

(a)     When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave

10

> *as soon as practicable* under the facts and circumstances of the particular case.  It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. . .
>
> . . .
>
> (b)  The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (*e.g.*, spouse, adult family member or other responsible party) if the employee is unable to do so personally. *The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed.  The employer will be expected to obtain any additional required information through informal means*.  The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

29 C.F.R. § 825.303 (emphasis added).

Defendant argues that plaintiff's claims cannot survive summary judgment because she has not established that she was entitled to FMLA leave covering the June 27th and 28th absences; defendant contends that she did not have a serious health condition and that, even if she did, she did not fulfill the notice requirements of the Act.

A.    **SERIOUS HEALTH CONDITION**

The purpose of the FMLA is "'to balance the demands of the workplace with the needs of families by ensuring the availability of 'reasonable leave' for employees who need time for health or family reasons." *Smith v. BellSouth Telecommunications, Inc.*, 273 F.3d 1303, 1313 (11th Cir. 2001) (quoting 29 U.S.C. § 2601(b)(1)-(2)).  Under the

Act, an eligible employee is entitled to take up to twelve weeks of unpaid leave if she

suffers from a ***"serious health condition"*** that makes her unable to perform the functions

of her position.  29 U.S.C. § 2612; 29 C.F.R. § 825.112.  As defined by the regulations, a

"serious health condition" includes an illness or physical condition which involves

***"continuing treatment by a health care provider"*** which, in turn, is defined as:

> (2)  Continuing treatment by a health care provider.  A serious health condition
> involving continuing treatment by a health care provider includes any one
> or more of the following:
>
> > (I)  ***A period of incapacity*** (i.e., inability to work... due to the serious
> > health condition, treatment therefor, or recovery therefrom) of ***more
> > than three consecutive calendar days,*** and any subsequent treatment
> > or period of incapacity relating to the same condition, that <u>also</u>
> > involves:
> >
> > > (A)  ***Treatment*** two or more times ***by a health care provider***. . . ;
> > > or
> > >
> > > (B)  Treatment by a health care provider on at least one occasion
> > > which results in a ***regimen of continuing treatment*** under the
> > > supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(i)(A),(B) (emphasis added).  ***"Treatment by a health care***

***provider"*** includes examinations to determine if a serious health condition exists and

evaluations of the condition," and a ***"regimen of continuing treatment"*** includes, for

example, a course of prescription medication (e.g., an antibiotic) or therapy requiring

special equipment to resolve or alleviate the health condition (e.g., oxygen)."  29 C.F.R. §

825.114(b)(emphasis added).

Plaintiff argues that her "illness of June 27 and 28, standing alone, constitutes a serious health condition based on Plaintiff's incapacity for four full days, treatment in the emergency room by a physician, and prescription medication." (Pl.'s Response at 11.) In order to establish a "serious health condition" plaintiff must establish that she was incapacitated for more than three days **and** that she received subsequent treatment by a health care provider who prescribed a regime of continuing treatment. 29 C.F.R. § 825.114(a)(2)(i)(A),(B) (emphasis added). Defendant contends that plaintiff has failed to establish that she was incapacitated for more than three days. (Def.'s Brief at 13.)

On the morning of June 27, 2003, plaintiff was treated in the emergency room at Shelby Baptist Medical Center for nausea, vomiting, diarrhea, chills, and fever. (Pl.'s Ex. 13.) She was released at 10:20 a.m. that same morning. (Id.) Discharge instructions signed by plaintiff's doctor state that she would be able return to work/school on Saturday, June 29, 2003, two days after the onset of her illness. (Pl.'s Ex. 13 at 4). However, plaintiff claims that she remained incapacitated through Sunday, June 30th, four full days after her illness began. (Pl. Depo. at 165-68.)

An employee's own testimony that she was too sick to work for four consecutive days is insufficient to show incapacity in light of her doctor's opinion to the contrary. *Brannon v. Oshkosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1037 (M.D. Tenn. 1995). In *Brannon*, the court states:

> Plaintiff does not meet the definition of serious health condition because, although she saw a doctor and was given three prescriptive drugs, there is

13

no proof that plaintiff was "incapacitated" for more than three calendar days.  Plaintiff stayed home from work for more than three days, but plaintiff cannot show she was unable to work, or that her absence was "due to" her illness.  First, Dr. Clapp never advised plaintiff to remain off work . . . Second, plaintiff's own testimony that she was 'too sick to work' is also insufficient to prove that her absence was necessary.  Finally, Dr. Clapp cannot testify that plaintiff was unable to perform the functions of her job at the Jamestown plant in light of her illness.

Because Dr. Clapp's testimony is not in dispute, and because it is legally insufficient to prove that her illness necessitated her absence, the court concludes that plaintiff's December 1993 absences are not worthy of FMLA protection.

897 F. Supp. at 1037 (M.D. Tenn. 1995) (citations omitted);  *See also, Price v. Marathon Cheese, Corp.*, 119 F.3d 330, 335 (5th Cir. 1997) (following *Brannon*; concluding that plaintiff failed to prove the requisite incapacity).

As noted in *Bond v. Abbott Laboratories*, 7 F. Supp. 2d 967 (N.D. Ohio 1998):

[That a plaintiff was "required" to be incapacitated for more than three days] does not mean that, in the employees' own judgment, he or she should not work, or even that it was uncomfortable or inconvenient for the employee to have to work.  Rather, it means that a "health care provider" has determined that, in his or her professional medical judgment, the employee cannot work (or could not have worked) because of the illness.  If it were otherwise, a note from a spouse, parent, or even one's own claim that one cannot work because of illness would suffice.  Given the legislative history surrounding its enactment, the FMLA cannot be understood to establish such liberal standards for its application.

*Id*. at 974 (brackets in original)(quoting *Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1166 (N.D. Ohio 1997) (internal citation omitted).  This court agrees with the above analysis.

14

In this case, after treating her on Thursday, June 27th, plaintiff's physician noted that she could return to work on Saturday, June 29th, two days later.  (Pl.'s Ex. 13 at 4.) The recommendation of plaintiff's doctor is contrary to her claim that she was incapacitated for four full days.  Because plaintiff has not established that she was incapacitated for more than three days, she has not adduced sufficient evidence to show that the June illness, standing alone, was a serious health condition.

Plaintiff alternatively contends that the gastroenteritis which caused her to be absent in June was a serious health condition because it was a recurrence of the condition which caused the incapacity she experienced in May.  Defendant argues that the two medical conditions were not related.

Under the regulations, a serious health condition includes "a period of incapacity and any subsequent treatment or period of incapacity *relating to the same condition*, that also involves. . . [t]reatment by a health care provider on at least one occasion which results in a *regimen of continuing treatment* under the supervision of the health care provider."  29 C.F.R. § 825.114(a)(2)(i)(A),(B) (emphasis added).  It is undisputed that plaintiff suffered a period of incapacity in May due to "chronic low back pain" and "viral syndrome."  (Pl.'s Ex. 10.)

Plaintiff argues that her gastroenteritis was a "recurrence" of the condition she experienced in May.  (Plaintiff's Response at 5.)  Plaintiff also argues that the "illness that occurred on June 27 and 28 was a continuation of problems she had experienced

15

prior to her hysterectomy in 2001." (Id. at 11.) Unfortunately for plaintiff, there is *no* medical evidence on which a reasonable jury could find plaintiff was receiving "continuing treatment by a healthcare provider" or that her medical problems on June 27th or 28th were "related to the same condition" for which she had earlier received FMLA leave.

Because plaintiff has failed to establish that she suffered from a serious health condition, she was not entitled to FMLA leave or the protections afforded by the FMLA.

### B.   NOTICE

Even assuming plaintiff's absences were due to a serious health condition, defendant is entitled to judgment as a matter of law because plaintiff failed to give the Notice required under the Act. During her employment with Blue Cross, plaintiff applied for FMLA leave twice, and received the requested leave both times. Plaintiff claims that the absences which served as grounds for her termination should have been identified by Blue Cross as covered by the FMLA.

Whether the notice given is sufficient to trigger the employer's duty of inquiry will depend on the facts and circumstances of the individual case. *Satterfield v. Wal-Mart Stores*, 135 F.3d 973, 980 (5th Cir. 1998). "[T]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Gay v. Gilman Paper*

*Co.*, 125 F.3d 1432, 1435 (11th Cir. 1997) (citing *Manuel v. Westlake Polymers Corp.*, 66

F.3d 758, 764 (5th Cir. 1995)).  The Court of Appeals for the Seventh Circuit has stated:

> Some of the regulations that the Department of Labor has issued suggest that
> merely by demanding leave, the employee triggers a duty on the part of the
> employer to determine whether the requested leave is covered by the FMLA.
> That is an extreme position, as most leaves requested by employees are not
> based on a ground entitling them to leave under the FMLA, so that if the
> position were accepted the consequence would be to place a substantial and
> largely wasted investigative burden on employers.  The position is rejected,
> rightly in our view, by the *Collins, Stoops* and *Satterfield* cases that we cited
> earlier, and also by *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir.
> 1997).  These cases hold that unless the employer already knows that the
> employee has an FMLA-authorized ground for leave, as in *Miller v. GB Sales
> & Service, Inc.*, 275 F. Supp.2d 823, 829 (E.D. Mich. 2003), the employee
> must communicate the ground to him; he cannot just demand leave.  Which is
> all that Aubuchon did.
>
> The employee's duty is merely to place the employer on notice of a probable
> basis for FMLA leave.  He doesn't have to write a brief demonstrating legal
> entitlement.  He just has to give the employer enough information to establish
> probable cause, as it were, to believe that he is entitled to FMLA leave.  That
> is enough to trigger the employer's duty to request such additional information
> from the employee's doctor or some other reputable source as may be
> necessary to confirm the employee's entitlement.

*Aubuchon v. Knauf Fiberglass, GMBH*, 359 F.3d 950, 953 (7th Cir. 2004).

Plaintiff argues that defendant was privy to information about plaintiff's health

problems and medical history sufficient to trigger its duty to investigate whether sick-days

contributing to her termination were due to an FMLA-qualifying serious medical

condition.  However, Blue Cross had only limited information regarding plaintiff's

alleged health problems.  Plaintiff's file contains the Certification Forms completed by

plaintiff's physician covering her previous FMLA leave.  However, the forms require

only basic information regarding the medical condition causing the incapacity.  (See, Pl.'s Exs. 4, 10.)  The documentation reveals only that the FMLA leave plaintiff took in November of 2001 was for a hysterectomy, and the leave in May of 2003 was due to "chronic low back pain" and "viral syndrome."  (Pl's Ex. 3 at 10-12.)  In neither instance, did plaintiff's respective physician certify her for intermittent leave or a reduced work schedule.  (Id.)  In both cases, plaintiff was returned to work without restrictions from her doctor.  (Id.)  Nevertheless, she argues that Blue Cross's knowledge of the circumstances surrounding her previous serious health conditions, along with its general knowledge that she suffered continual "health problems," was sufficient to trigger a duty to investigate whether any absence she incurred was protected under the FMLA.  (Pl.'s Response at 11-17.)

Specifically, plaintiff contends that Jeff Hairrell "knew of the medical problems Plaintiff was having at the time he terminated her."  (Pl.'s Response at 13.)  In February, 2003, plaintiff sent an email to Hairrell which states:

> I just wanted you to know *from me*, that last year, I had used a lot of sick time and this was documented in my personnel file (you may or may not already be aware of that).  I had some **health problems** and some ***other things going on*** that caused me to be out a lot.

(Pl. Depo., Ex. 9) (emphasis in original).  Plaintiff argues that the information in the email together with the documentation regarding FMLA leave she had taken in the past, was enough to put Hairrell, and by virtue Blue Cross, on notice that she might be entitled to intermittent leave due to a serious health condition.  However, in *Slaughter v. American*

*Bldg. Maintenance Co. of New York*, 64 F. Supp. 2d 319, 328-329 (S.D.N.Y. 1999), the court held:

> None of the doctors' notes submitted by Slaughter state that Slaughter would require intermittent leave.  Indeed, the September 29, 1995 note from Carrera certified that Slaughter would be able to return to work on October 2, and does not limit the tasks that Slaughter could be assigned.  It would neither be reasonable nor consistent with the FMLA's notice requirements to impose a burden upon ABM to inquire affirmatively for every absence thereafter whether Slaughter was, in fact, seeking leave because of his back.

Blue Cross's awareness of the mere fact that, in the past, plaintiff had allegedly experienced "health problems" including "chronic low back pain" and "viral syndrome," is not sufficient to trigger a duty on the part of Blue Cross to affirmatively investigate whether each of plaintiff's absences was covered by the FMLA.

Plaintiff focuses primarily on the two days plaintiff was absent in June 2003 because of gastroenteritis, arguing that she told her employer enough about her condition on those days to constitute notice of a serious health condition.  She contends that Blue Cross should have investigated whether the gastroenteritis, standing alone, was a serious health condition, and also whether it was related to the "chronic low back pain" and "viral syndrome" for which she had taken FMLA leave the month before.

On the morning of June 27th, when plaintiff was unable to report to work, she called her team leader, Leigh Holcomb, not her supervisor or a Blue Cross manager, explaining only that she "wasn't feeling well."  (Pl. Depo. at 159.)  Plaintiff also had her seventeen year-old daughter, Tiffany, call Marcia Curry, a fellow instructor, to let her

know that plaintiff would be absent from work that day.  (Id. at 161.)  With regard to the reason for plaintiff's absence, Tiffany told Curry only that she was "very sick and at the hospital" and that she had "an IV attached to her arm."  (Id.)  Plaintiff did not attempt to personally provide notice of the reason for her absence to her supervisor, nor did she ask either Holcomb or Curry to relay a message to plaintiff's supervisor.  Plaintiff testified that Holcomb told her that she had "let [a supervisor] Barbara Henry know that. . . I was at the hospital and I was dehydrated.  And they gave me medication and sent me home to recuperate."  (Id. at 162-63.)

Plaintiff was out all day, Thursday, June 27th, and she did not return to work the next day, Friday, June 28th.  (Pl. Depo. at 165-68.)  When she returned to work the following Monday, Jeff Hairrell came to her office to see how she was feeling.  Upon his suggestion "that [she] maybe need[ed] to take some vitamins so that [she] would not catch everything," plaintiff testified that she responded: "That's a wonderful idea.  I will take your advice."  (Id. at 171-73.)  It is clear from the comments Hairrell made to plaintiff on Monday that he was under the impression that plaintiff's illness was something akin to a common cold or stomach bug, but plaintiff told him nothing to make him believe otherwise.  Other than the brief exchange with Hairrell, plaintiff did not discuss the reason for her absence with anyone, other than to say "I'm getting better," when asked.  (Id. at 174.)

On Tuesday, July 2nd, Jeff Hairrell had a formal meeting with plaintiff in which he expressed concern that she had violated the terms of the March 3rd Memo by taking more than eight sick hours in the month of June *without providing a doctor's excuse.* (Hairrell Depo. at 12-14, 17; Pl. Depo. at 181-183.)  At that point, plaintiff was aware that her job was in serious jeopardy, yet she did not provide a doctor's note and, again, failed to make *any* further explanation about the illness which caused her to be absent.  (Hairrell Depo. at 37.)  No reasonable jury could find that with the information it was given, Blue Cross should have assumed that plaintiff's visit to the hospital in June was due to a serious health condition, or that it was somehow related to her hysterectomy, "chronic low back pain" or "viral syndrome," as she claims.

Also relevant is plaintiff's employment history and her knowledge and utilization of Blue Cross's rules and procedures concerning leave and absenteeism.  See *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 978 (5th Cir. 1998).  After two previous warnings regarding her excessive absences, on March 3, 2003, plaintiff received a "final written warning" which made clear that only eight non-FMLA sick hours per month would be tolerated, and that she risked termination if she exceeded that amount.  (Pl. Depo., Exs. 10, 16.)  The memo also specifically differentiated between unexcused sick time and qualified leave, which would not count against her under Blue Cross's attendance policy, stating: "Should there be a serious illness, Audra will need to bring a doctor's excuse for the absence and/or *consider applying for any necessary leave time*." (Id.)  Plaintiff

utilized Blue Cross's FMLA policy without incident for the second time just two months after receiving her final warning, which indicates that she understood defendant's FMLA procedures and that she understood the parameters of her final warning.  Under the circumstances, it would have been reasonable for Blue Cross to presume that any absence for which plaintiff did not present a doctor's note or ask for qualified leave, was not due to a serious health condition and would not qualify for FMLA leave.

Considering all of the facts and evidence, no reasonable trier of fact could conclude that the meager information plaintiff imparted to Blue Cross was sufficient to require it to inquire as to whether her absences qualified for FMLA protection.  See *Satterfield*, 135 F.3d at 980-81.  Therefore, plaintiff has failed to establish a claim under the FMLA and defendant's Motion for Summary Judgment is due to be granted.

## III.   CONCLUSION

For all of the foregoing reasons, the court is of the opinion that there are no material facts in dispute and that defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment and dismissing this case will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 30th day of March, 2006.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE